## 43946. ALLRIGHT AUTO PARKS, INC. et al. v. CITY OF ATLANTA.
(357 SE2d 797)

PER CURIAM.

This is an appeal from a judgment of condemnation in the Superior Court of Fulton County. We affirm.

The condemnation is associated with the redevelopment of the old Underground Atlanta district in Atlanta. The history of the planned redevelopment has been summarized by this court in two earlier cases, *Nations v. Downtown Development Auth. of the City of Atlanta*, 255 Ga. 324 (338 SE2d 240) (1986), and *Nations v. Downtown Development Auth. of the City of Atlanta*, 256 Ga. 158 (345 SE2d 581) (1986). Those appeals concerned challenges to the validation of bonds to finance the development. In the instant litigation, the appellants own and operate a parking lot at the corner of Martin Luther King Boulevard and Pryor Street in Atlanta which the City of Atlanta is attempting to condemn as part of the site for a parking garage which will be part of the Underground Atlanta redevelopment.

On April 26, 1985, the Director of the City of Atlanta Bureau of Purchasing & Real Estate, Dave Miller, mailed a letter to the appellants' office in Houston, Texas, which they received on April 30. The letter notified them that their parking lot was scheduled for acquisition as part of the redevelopment, and informed them that under OCGA § 36-61-9 (c) they had the option of notifying the appellee of their willingness and intention to develop and maintain the property in accordance with the appellee's urban redevelopment plan, see OCGA § 36-61-2 (20). Thereafter, the appellants attempted to learn the details of the plan's specifications for the development of their property, in order to determine whether they wished to exercise their option under § 36-61-9 (c). No specifications were made available by the appellee.

In July 1985, the appellee filed a complaint for an in rem condemnation proceeding pursuant to OCGA § 22-2-100 et seq. and OCGA § 36-61-1 et seq. In its complaint the appellee alleged that acquisition of the appellants' property was necessary for the Underground Atlanta Urban Redevelopment Project. A special master appointed by the superior court conducted an evidentiary hearing.

At the hearing, Gary Holmes, Chief of the City of Atlanta Office of Economic Development, testified that he had participated in discussions with "Mr. Miller and [City?] Council [and] [m]embers of the City Attorney's office" about sending the letter. He said "the basic nature of the discussions was adequate notice to people who can participate in the plan . . . ." When questioned about why the letter had been sent, he replied that, "[v]ery simply, we sent the wrong letter." Director Miller testified that the letter of April 26 had been sent by

mistake. When asked whether he had discussed the letters to property owners with the City Attorney's office before they went out, he replied, "No, we had discussions on the process by which clients would be notified. I'm not saying we specifically had a discussion relative to [the appellants' property] as opposed to any — any of the others."

Mr. Holmes gave his opinion that acquisition of the appellants' property and construction of a parking facility on it was necessary for completion of the overall redevelopment project. He testified that as of the date of the hearing the appellee was preparing but had not yet completed plans for the particular type of parking structure which was to be placed on the appellants' property. According to Mr. Holmes, if the condemnation were successful, the appellee planned to retain ownership of the land and then lease it to the Downtown Development Authority (hereafter, DDA). The facility then would be either leased to or operated under contract by a private company. Holmes testified that this was merely his understanding of how the facility would be operated, since this point was not specified in the urban redevelopment plan.[1] Mr. Holmes also told the special master that the parking structure would be open to citizens using other buildings or areas outside Underground Atlanta.

Thereafter, the special master filed an award recommending condemnation of the subject property for the use of the appellee, and the condemnees filed exceptions. The appellee filed an amendment to its complaint for condemnation, adding 1983 Ga. Const., Art. IX, Sec. II, Par. III (a) (11) as an additional ground for condemnation. In April 1986 the superior court entered judgment for the appellee, overruling and denying all of the appellants' exceptions.

1. The appellants contend that the appellee's letter of April 26, 1985, should estop it from denying the appellants the opportunity of developing its property in accordance with the urban redevelopment plan, once finalized. We disagree, because the appellants have not shown that "it was the governing body, i.e., city council, rather than a mere employee carrying out a ministerial function, which knowingly chose or did such act which it tried to undo." *Corey Outdoor Advertising v. Bd. of Zoning Adjustment of the City of Atlanta*, 254 Ga. 221, 224 (3) (327 SE2d 178) (1985). The testimony of city officials Miller and Holmes, while suggestive of the exercise of authority con-

---

[1] It should be noted that the special master's hearing occurred in July 1985. In January 1986 we disapproved part of the redevelopment plan. *Nations*, supra, 255 Ga. Thereafter, the City restructured the plan, which had originally called for the City to retain title and then lease to the DDA. As of July 1986, the plan proposed for the City to convey to the DDA after acquiring the property, and then to lease back from the DDA for subleasing to private developers. *Nations*, supra, 256 Ga.

ferred by city council, is not specific enough to meet this test. Moreover, the fact that the appellants' employees fruitlessly attempted to comply with the letter of April 26, 1985, does not constitute a substantial change in position detrimental to the appellants. See *P.C. Gailey Contractors v. Exxon Co.*, 143 Ga. App. 827 (2) (240 SE2d 208) (1977).

2. The superior court found that the appellee is not subject to the requirements of OCGA § 36-61-9 (c), because the subject property is to be used for a "public use." Appellants contend that this holding is erroneous. We disagree.

Section 36-61-9 (c) states that *"[u]nless the property is to be acquired for the purpose of devoting it to a public use*, a municipality or county may not acquire real property through the exercise of the power of eminent domain pursuant to subsection (a) of this Code section until the following conditions and requirements have been met: (1) The municipality or county shall, in writing, notify the owner of the real property proposed to be acquired of the planned use of the property as set forth in the urban redevelopment plan for the urban redevelopment area wherein the property is located. (2) Within 30 days after being so notified, the owner of the property shall have the option of notifying the municipality or county, in writing, of his willingness and intention to develop and maintain the property in accordance with the urban redevelopment plan . . . . (3) When the owner of such real property exercises the option provided by paragraph (2) of this subsection, the municipality or county shall make an investigation to determine the ability of the owner to develop and maintain the property in accordance with the urban redevelopment plan. In making such an investigation, the municipality or county shall examine the financial and legal ability of the owner and such other factors as may be relevant to making the determination. (4) If the municipality or county determines that the owner of such real property has the ability to develop and maintain the property in accordance with the urban redevelopment plan, the owner shall have the right to retain ownership of the property by executing an agreement with the municipality or county to develop and maintain the property in accordance with the urban redevelopment plan. Any such agreement shall be as the municipality or county deems necessary and appropriate as to form and content . . . ." (Emphasis supplied.)

The issue for this court to decide is, stated simply, whether the planned parking structure is to be devoted to a "public use" or a "non-public use" within the meaning of OCGA § 36-61-9 (c). If, as the trial court held, it is to be devoted to a "public use," then the requirements of § 36-61-9 (c) are not triggered. Moreover, because the Urban Redevelopment Law does not expressly define the term "public use" for purposes of applying § 36-61-9, it is our task to infer the intended

meaning. We have held that the question of public necessity or public purpose is a matter of legislative discretion which will not be interfered with or controlled unless the condemning authority acts in bad faith. *City of Atlanta v. Heirs of Champion*, 244 Ga. 620 (261 SE2d 343) (1979). We have distinguished bad faith from negligence and have gone so far as to equate it with conscious wrongdoing motivated by improper interest or by ill will. *City of Atlanta v. First Nat. Bank of Atlanta*, 246 Ga. 424 (271 SE2d 821) (1980).

In *City of Atlanta v. Petkas*, 253 Ga. 447 (321 SE2d 725) (1984), we again recognized this court's reluctance to find bad faith on the part of a condemnor in its determination of public purpose in the exercise of the right of eminent domain. In so holding, we pointed out that the court's decision in *Earth Management v. Heard County*, 248 Ga. 442 (283 SE2d 455) (1981), did not erode the authority of condemning bodies nor change the law as announced in *Heirs of Champion* or *First Nat. Bank*. We said there that ". . . the import of that holding is that a condemning authority may not utilize the power of eminent domain to restrict a legitimate activity in which the state has an interest." 253 Ga. at 449.

It is argued that the issue here is not controlled by those cases dealing only with the exercise of the power of eminent domain but rather involves cases in which the law requires a governing authority to offer the right to develop and maintain the project under § 36-61-9 (c). Appellant contends that *McCord v. Housing Auth. of the City of Atlanta*, 246 Ga. 547 (272 SE2d 247) (1980), presents the answer. In that case we said that, "[t]he old law, enacted in 1955, granted an absolute power of eminent domain to municipalities, permitting them to take private property for any purpose — public or non-public — so long as the condemnation was to effectuate an urban redevelopment plan. The evil was that this *was* an absolute power. Private property could be condemned by a city, then sold to private developers who would develop it and resell it. The landowner who had the resources to develop his land in accordance with an urban redevelopment plan was denied the right to do so under the old law. In 1971 the General Assembly enacted [§ 36-61-9 (c)]. This section gave a private landowner the option of retaining ownership of his land and developing it in accordance with the urban redevelopment plan when the land was to be put to a non-public use. This was the remedy. The obvious intent of the legislature was to protect the interests of private landowners when a city sought to condemn their land for a non-public use." Id. (I) at 550.

*McCord* does not, in so many words, state what is and what is not a "public use," but it indicates that the sale of condemned property to private developers for development and resale is a private use. In the instant case, the putative redevelopment plan calls for *leasing or*

*contracting out the management of* the condemned property to an entity which could be a private party. Thus, the enterprise to be carried out would be one with public ownership and possible private management. We do not find this to be inconsistent with public use. The mere fact that a city or county may contract with private persons or organizations to provide a public function does not convert the service provided into a non-public function. Fire protection is an apt example. When a public agency maintains ownership and merely contracts or leases for management and operation, we will look to the service performed rather than the status and relationship of the parties.

This brings us to the question of the nature of the service to be performed. To put it directly, does the construction and operation of a parking garage amount to a public use of the property? In *City of Atlanta v. Petkas,* supra, the City was seeking to condemn an easement to construct an underground pedestrian tunnel between a MARTA station and a bank office building. The landowner contended the tunnel would serve no public purpose because it effectively served only the private use of those persons who worked for the bank. We found there was evidence that the absence of the tunnel would cause persons to cross the street at motor vehicular traffic level and that the avoidance of the congestion caused by such crossing is sufficient as a public purpose. Hence, it becomes apparent that evidence of public use need not be overwhelming.

A finding of public use here has several supports. The site condemned lies near the center of Atlanta where traffic is heavy and parking is scarce. Common experience tells us that the absence of parking contributes to congestion. The proximity of the Underground Atlanta project and the government buildings adds to this, but the public nature of the parking garage does not depend upon their proximity. It is the need for public parking and expedition of traffic flow which makes the difference. Furthermore, the people of Georgia bolstered this evidence and reasoning by giving public use status to parking facilities when they ratified the constitutional designation of such facilities as being among those services which counties and municipalities may provide. 1983 Ga. Const., Art. IX, Sec. II, Par. III (a) (11).

We cannot say that appellee abused its discretion or that the trial judge erred in following the constitutional guideposts.

3. The appellee contends that the judgment of condemnation should be approved on the basis of the superior court's alternative ruling that the appellee had the right to condemn the property independent of the Urban Redevelopment Law. In view of our holding in the preceding division, it is unnecessary to reach this question.

4. Appellants assert that a municipality may not take private

property devoted to a commercial parking use and devote it to the same use. We do not agree because differences in character and size of parking facilities may be substantial. A ground level parking lot may be inadequate to meet public needs while a multi-story parking garage may meet the need for off-street parking spaces and alleviate traffic congestion. Such a finding is not error.

*Judgment affirmed. All the Justices concur, except Smith, Weltner, and Bell, JJ., who dissent.*

WELTNER, Justice, dissenting.

My only quarrel with the majority opinion is a factual one — that is, whether the planned parking structure "is to be acquired for the purpose of devoting it to a public use" within the meaning of the Code section.

Obviously, every acquisition of property by the exercise of the power of eminent domain must be in the "public use" broadly conceived — else it would be mere expropriation. In this larger sense, the parcel in question is to be devoted to a public use. However, our previous discussion in *McCord v. Housing Auth. of the City of Atlanta*, 246 Ga. 547 (272 SE2d 247) (1980) distinguished between two types of acquisitions, "public or non-public." The former I perceive as devoted to the discharge of public functions with but minimal admixture of private enterprise. In this case, while the public interest would be served by an economic success of the project, the *basic use* for the entire assemblage is a conglomerate of privately-operated, for-profit enterprises.

This, I suggest, is a "non-public" use, bringing it within the redevelopment option provided in OCGA § 36-61-9 (c) — subject, of course, to compliance by the owner with the redevelopment plan, including reasonable parking fees.

I am authorized to state that Justice Smith and Justice Bell join in this dissent.

DECIDED JULY 15, 1987 —
RECONSIDERATION DENIED JULY 30, 1987.

*Sutherland, Asbill & Brennan, John W. Bonds, Jr., Richard L. Robbins*, for appellants.

*Thomas A. Bowman, Marva Jones Brooks, Robert L. Zoeckler*, for appellee.

*Kutak, Rock & Campbell, Felker W. Ward, Jr., Jo Lanier Meeks, Long, Aldridge & Norman, Clay C. Long*, amici curiae.